And once the table is clear, you may call the next case. 166760, United States of America v. Aaron Osborne Oral argument not to exceed 15 minutes per side. Turn the light on. Turn the light on, please. Oh, it's on. Okay. You may proceed. My name is Andrew Brandon. I'm here today on behalf of Mr. Aaron Osborne. At this time, I'd like to reserve three minutes for rebuttal. Thank you. Your Honors, the GRAP program was a fiasco. It was a rudderless ship so devoid of supervision and control that it devolved into chaos and scandal and ultimately Senate hearings. The government, rather than fixing it, just dismantled it. And that same government, I anticipate today, will argue that it was characterized by ample supervision and controls or at least sufficient to sustain this conviction. Can I ask you a question? The primary, I think, the foundational questions here are really what the proof in the record shows. And then you get to what you do with that. Did this company, the contractor, have business other than this program? Yes, Your Honor. And so it had other contracts that were not with the government, right? I believe so. And it did what it was obligated to do to the government. And we don't have the contract that shows what it was obligated to do. But apparently there's some testimony when a task order reflects what the obligations were. Your Honor, we do have the task order that they claimed was substantially identical to the one that was in play at the time of the alleged offense. I understand that. But anyway, the point at which the government money comes into it is a reimbursement. Is that right? That's correct. But they're using presumably other government funds to run the program? I mean, the specific money that would have been tied to Mr. Osborne's activity doesn't enter the picture until after Mr. Osborne has completed his criminal activity, if it is criminal. I believe that's correct, Your Honor. Does that make any difference? Well, I think it's very confusing here. I mean, I think you're pointing to these questions that I would argue should have been answered at trial by the party that had the burden of proof. There is very little at trial about how this money transferred. They didn't even submit the invoices in question that would have shown where that money came from and how it went out. We know there were some reimbursements from the government, but I'm not sure exactly when or how they came out. Okay. Turning to this question of supervision and control, unless the Court has specific questions, I would propose to address an issue that hasn't been fully discussed in the briefs. We've discussed the evidence of control and evidence of supervision in the contract, but I don't think that we've discussed sufficiently over whom the government is exerting control. And that is an issue that is vitally important to every case cited in both my brief and the government's brief. And I think that that's really the driving question in this case. And I've cited extensively to the Hall opinion from this Court, but I want to use that as sort of a touchstone. And there in Hall, you had the Department of Energy contracting with Oak Ridge National Laboratory, which is itself a sort of quasi-government entity. And then there's a subcontractor, AIMSI. And one of the key elements in that case is that the contract between Oak Ridge and AIMSI says, hey, AIMSI, you are subject to audit at any time, not by us, not by Oak Ridge, but by the Department of Energy. And so if we sort of analogize our facts to that, you've got a contract between the Department of Defense, you've got DOCUPAC. And there's a contract here, and it doesn't even have an audit requirement. The only mention of an audit in that supposed contract says, hey, we, DOCUPAC, are permitted to audit ourselves occasionally. That's it. So there's no real control there. But if we set up the analogy, the important question is what did government control was there for the subcontractors, which in this case were the recruiting assistants. And the answer is none. We don't even really have a contract between DOCUPAC and the recruiting assistants. We have an online quiz. And so this question, and the reason this is important, is that in order to be supposedly stealing from the government, all of these cases, every case we've cited, has said that the supervision and control isn't just generally over the money. Of course the government wants to control money it spends. But that supervision has to be exercised over the people who are allegedly stealing it. And this plays out in every case that we have. And I'll just ‑‑ Well, the reason for that would be simply that you can't control your money unless you control those who are spending it. Well, that's correct. But we're at a danger here of saying, I mean, lots of money out there has some sort of federal strings attached to it. But I would submit that if someone, if an employee of AIMSI or even a subcontractor of theirs had stolen money, you know, there's a point at which it has to end, that this is no longer federal money, or else we can, any time somebody steals something, you get federal jurisdiction. And I would submit that we just can't be expanding the domain of this statute so far. And I want to just emphasize this point by I would suggest that the worst case for our side is the McKay case from the Second Circuit. And I want to highlight that even there, this supervision and control is exerted on the defendant. There, the defendant, Mr. McKay, was a landlord. And he was getting low‑income housing funds from a local housing authority that contracted with HUD. But isn't there the control of the assistance by virtue of Crain's, when he testified that he told them never offer to split money with potential airmen, this is theft and can cause immediate termination, isn't that control? Well, it suggests control from DOCUPAC, not from the federal government. But why wouldn't DOCUPAC be giving that, having that, exerting that control because they were told to do that by the government? Well, there's no evidence that they were told to do that by the government. But couldn't the jury infer that from his testimony? I don't think so. And, I mean, the same witness essentially misrepresented that that was in the contract. He said that's in the base contract with the government. It's not. It's not there. And so, you know, we demonstrated that. And so I don't think that the jury could infer that the government had said that. I'm going to, I personally am going to have to, I have not read all the trial transcript, but it's going to be really important to do that in this case. Where should we look from your vantage point? Through what witnesses did the government seek to establish control? From your vantage point. I'm going to ask them the same thing. Crane and Stewart. And what's so remarkable about that is that they're two witnesses from a private entity. No one from the government, no one who could testify about the nature of this contract. These sort of experts appear in other cases, but there was nothing here. Crane and Stewart are both DocuPact employees. Right. And they're the only people who testify about what was in that contract. And, again, the contract is important here because every case says what's in the contract and specifically how does it apply to the defendant. And, again, in this McKay case, what they found is that McKay was the brother of the head of the local housing authority. And the Second Circuit says look at the HUD contract with the housing authority and then look at the housing authority's contract with the landlord. Is your understanding that there was not a contract that governed the overall relationship, that there were only task orders? I mean, task orders would relate to a particular use, I would think, of a recruiter. I desperately wish I could answer that, Your Honor. I mean, we didn't even have the task order at issue here. But there was some reference to a base contract, but then the same witnesses said, oh, yeah, this was the base contract. And I think that I'm with you. I don't know. I don't see how a task order could be a base contract. I agree completely. I would love to have seen all of this in evidence so that the government could have met its burden, but I don't believe it. Well, you might have loved to see it in evidence. You might not have, but it isn't in evidence in any event. Absolutely, but it was not there. And, again, that could have established any assumption of a relationship between the government and the ultimate subcontractors, but it just wasn't there. And one last point I'd like to make is I think it's important to look at who they're talking to. I mean, these cases, what this court has referred to as kind of the third category of theft of government property cases where the money goes through some other hands, these cases, this is essentially every case we've cited. The defendant in Hall was the founder of the company who had signed the contracts in folks from this court. It was a Salvation Army director who, quote, had virtually complete control over the purchasing of food for this emergency program that was funded by FEMA. In Johnson, they said, this is the Ninth Circuit Johnson case, said, the appellant as president of the union and as the person who actually signed the contracts and payroll checks cannot claim he was ignorant of the source and nature of the funds. In Littriello, it was the comptroller and the accountant of the postal union plan. In Dinkins-Robinson in the Fourth Circuit, it was the executive director of the school. In Reynolds in the Seventh Circuit, it was the founder of a redevelopment company that was- So the point is it would be the individual who was the recipient, direct recipient of the government funding. And who has some relationship with the government where the control and supervision is exerted on that person or the entity that they, in almost every case, the entity that they run. Thank you. Just one minute. The issue of whether you preserve the issue of sufficiency of the evidence on your Rule 29 motion, the motion was sort of phrased in terms of what specific issues were being preserved instead of just in general preserving sufficiency of the evidence. So if you, for example, preserved the issue of whether the property was government property in your Rule 29 motion but not that the property was stolen, then it would seem that if you made a specific- if you set forth specific bases for your Rule 29 motion but didn't cover all those, it would seem that some of the issues or sub-issues might have been waived. And I'm wondering what you have to say about that. I'm familiar with that case law. I don't know what to say other than I don't like it. I think it sets up lousy incentives to say as little as possible in your motion, put it on the court, and then you've preserved everything. Whereas in this case, the parties went back and forth on this question of, you know, is this government property? And I'd acknowledge that- I thought that the waiver issue related to another- the stolen- Yes, to whether it was theft. And my point is just I would acknowledge that I don't believe that issue was well addressed in the specific Rule 29 motion, but I think- The point about whether it was government property or not is simply that that's what you were concerned with from the very beginning. That is specifically addressed. Not that it's the issue that was arguably waived. Right. The issue that was arguably waived is whether it was theft. And, again, I think it's- in an issue where we were hotly debating this specific question, I just think it's odd to suggest that, you know, we should have been- we should have said less, and that would have preserved everything. I think that's a bad rule. I'm not sure it's necessarily the rule. But if it is, I don't like it. Yeah, well, yeah, of course, this panel didn't generate that case law. We have the Wesley case and some other cases that come into play here. But thank you very much. Thank you. You may proceed. Good morning, Your Honors. May it please the Court, John Taddy for the United States. I'm not going to spend time addressing whether the funds were stolen. It sounded like Mr. Osborne acknowledges that the case law there indicates that he waived that argument below. So unless the panel has questions about that, I'm going to spend the bulk of my time focused on the question of government control. I'm not sure he's altogether conceding that issue as to whether it was stolen. If the case law supports that, he doesn't like the case law, but he didn't concede that necessarily. I mean, I wouldn't spend any time on it either if I were you particularly, but, I mean, I'd focus on the other issue. But you might have slightly exaggerated what he said. All right, Judge Gavins. Well, if there is time remaining, I will mention that issue. But I'm going to focus the bulk of my time on control. And as Your Honor first started out. Before you get into that, let me just ask you really, what is there in the case law or rule that says that a recruiter can't split money with recruiting assistants? Is there something in terms of legal authority that directly addresses that issue? Well, what directly addresses that issue is the training that the recruiting assistants received when they first signed up for the program. What they were specifically told as a condition of participation in the program, and this is in Government Exhibit 3 at page 12, which is the training that they received. What if my recruiter tells me he will split the money if I say I brought the person into the GRAP program? This is theft and cause for immediate termination and civilian criminal prosecution for you as a civilian. The recruiter will face possible separation from service and prosecution. There are a number of different... This is the full-time recruiter, such as Mr. Osborne, or the recruiting assistant? The recruiting assistants received that training. But there was also testimony from individuals like Carol Byerly, who was Mr. Osborne's supervisor. Another man named Mr. Epps, who was also a full-time recruiter, who testified that this was something that full-time recruiters like Mr. Osborne were aware of, that they had received training on this. Ms. Byerly also testified that Mr. Osborne had attended training seminars and that it was a well-known fact that this was a condition of the GRAP program that someone like Mr. Osborne, with 30 years of experience within the Air National Guard, would have been familiar with. But on top of that, Your Honor, the two discrete questions of law... Was there any paper document supporting their testimony? Or were they just giving testimony about what somebody else would have known? I mean, I know that his intent is not an issue here, but it just didn't sound to me like that amounted to much. Well, there is testimony, one, as is discussed in the briefs and as Mr. Osborne discusses, from the president of DOCUPAC, Mr. Crane, and from another supervisor of the GRAP program at DOCUPAC, that this was something that was an aspect of the program. There was Government Exhibit 3, which is a printout from the training that recruiting assistants receive. There's also significant evidence about Mr. Osborne's consciousness of guilt when it was discovered that there was an investigation into this, that he told Mr. Andelsack to basically cover it up, to claim these recruits as his own. But in addition to that, Your Honor, the crime that Mr. Osborne was convicted of was aiding and abetting Mr. Andelsack's theft. Mr. Andelsack pleaded guilty to conspiracy to violate Section 641. He testified at trial specifically that he made false entries in the GRAP electronic diaries, and he did so because he knew that the government would not give him money. His intent is not in question here. It's not an issue. I mean, I don't really see why it matters what the recruiting assistants knew. I mean, Mr. Osborne's intent is not an issue anyway. No, Your Honor, it's not an issue. Look, I mean, I think it's appropriate to ask you about the evidence that supports control here. I mean, you didn't try the case. You did or did not? I did not, Your Honor, no. You're not on the brief. No, Your Honor. But you're here. Yes, Your Honor, I am. So maybe you could tell us. I view this record as showing, as portraying a program in which the government just, in fact, exercised little supervision, little if any, although perhaps it could have exercised more. But in fact, it seems pretty much like DocuPack was on its own. And I'm unclear at which point. It seems to me like DocuPack was reimbursed. So there wasn't any government money until after the fact. I don't know if that makes any difference or not. But if DocuPack is not using government funds to pay the recruiting assistants and it's not reimbursed until after the fact, it's pretty hard for me to see exactly how Mr. Osborne stole government money unless DocuPack is in some way, you can determine that DocuPack is using government funds and there's some remaining control over those funds to pay the recruiting assistant. But DocuPack, I've been told by your adversary, is doing other business. And I don't think there's anything in the record that really shows, that traces a line between money from the government and money that went to Mr. Osborne. So tell me why that conclusion is wrong and what I should look to in the record. Certainly, Judge Gibbons. Well, I think there's two principles at play here. One is that as— I'm not really asking about a principle. I'm asking about evidence in the record. And I will certainly discuss that evidence. But I think first it's important to consider, as of course Your Honor is aware, the evidence is viewed in the light most favorable to the prosecution. I don't care about that. I want to know what I'm going to find when I have time to read this record. Yes. So the Hall case the government would acknowledge is— I don't want to know about the Hall case. I want to know what proof is in the record. Okay, so— Don't give me an answer that says anything other than the evidence shows that's where you begin. So what was the ultimate source of the funds? The Department of Defense created the GRAP program. No, no. The evidence. I'm talking about the evidence in this case. Where do I find that? The evidence for that is the testimony of Mr. Crane on page 1487, who testified that DOD created GRAP and then hired DOCUPAC to administer it. That appears to be undisputed. Yes, that is undisputed. Also, DOCUPAC did, yes, initially pay the finder's fees to recruiting assistants, but the Department of Defense reimbursed those funds. It was the federal government that was stuck with the check at the end of this process, not DOCUPAC. And again, Mr. Crane testified to that on pages 1486 and 1677 of the record. Second, whether DOCUPAC was required to maintain and report on different financial information. The management of the RA funds, and this is in the task order on page 13, the management of the recruiting assistant funds, including interaction between the GRAP database, DOD systems, and DOCUPAC's financial system is a critical factor to the success of GRAP. So that shows that it was important that the computer systems of the DOD and GRAP, as administered by DOCUPAC, interacted. And the actual process whereby RAs signed up and were paid is also important. Before an airman could even become a recruiting assistant, DOCUPAC had to run that RA's name through a database. If that database that was run by the DOD said that they were qualified, then they could become an RA. Then they had to go through the training that I previously discussed, where they were informed that if they split proceeds with a full-time recruiter, they could be prosecuted. Then after that, before any recruiting assistant could be paid for recruiting a potential airman, DOCUPAC had to submit that potential airman so that recruits information to the DOD. It was run again through a DOD system, and the DOD did not return verification to DOCUPAC unless that person was qualified. And Mr. Crane testified that as well on page 1501, 1676, and 1752 and 1753. Mr. Stewart, who is the manager of the program more directly, testified about it on pages 1830 and 1831, and it was in the task order in appendix page 25. And here's another critical fact, Your Honor, which is Mr. Crane testified specifically that in order to get reimbursed by the Air National Guard for the money that they forwarded to the recruiting assistants, that they had to submit invoices. And I quote Mr. Crane, if you don't submit a form, you don't get reimbursed. But you don't have the contract, the underlying contract. You don't have the task order for this particular transaction. You don't have any invoices, right? We don't have invoices, but, Your Honor, Mr. Crane testified that. Do you have the underlying contract? For purposes of this case, yes, we do. Mr. Crane testified. But there's no underlying contract? The contract is a task force from 2007? That's not anything that pertains to this case. But that is the contract for purposes of the appellate record, Your Honor. Mr. Crane testified that it's substantially similar in material effect to whatever agreement DOCUPAC would have been entered into previously. In fact, defense counsel is the one who entered the contract into evidence and said during the trial that this is the binding document that sets the parameters of the rules. That's page ID 1693 through 1696 is when this was discussed. So for purposes of this case and what the jury was presented, that task order was the contract between the parties, and the provisions that were set forth are what governed the DOD's oversight of this particular program. What evidence is there of oversight? Other than this evidence about the involvement of the database in hiring recruiting assistants? Yes, Your Honor. In addition to the steps that you have to go through in order to become a recruiting assistant, to be trained, to receive money for DOCUPAC to reimburse, which was all run through the Air National Guard, on appendix page 16, a National Guard Bureau soldier was assigned to monitor the process and quality of DOCUPAC's performance. DOCUPAC was required to submit annual, semi-annual, and quarterly reports, budget reports, and monthly RA payment analysis reports. Mr. Stewart testified to that on page 1834, and that's in appendix pages 23. Who is Stewart? Stewart was the individual who was the DOCUPAC employee who oversaw. But you don't have any documentation relating to that. We do, Your Honor. This transaction? I'm sorry? This transaction, you have invoices? For which transaction? The transactions? The one involving the assistant who was paid, who then gave Mr. Eisbert a kickback. Yes, we do, Your Honor. Who had that? Government Exhibit 5. On Government Exhibit 5 is the recruiting assistant overview for Mr. Andelsack, in which it indicates payments that were made via the $1,000 prepaid visa cards to Mr. Andelsack for recruiting certain individuals, and many of those individuals are the ones who testified at trial. How are those prepaid visa cards being funded? They were funded by the government. The government provided money to DOCUPAC. I thought the government reimbursed. It did, but DOCUPAC wasn't performing this program out of the goodness of its own heart. It was a business that was hired by the government. I don't know that it makes any difference that the money came subsequent, but it might. Is there any evidence that the government paid DOCUPAC, and then DOCUPAC went and funded these visa cards? It happened the other way around, didn't it? Well, the government did. There was evidence within the task order that the government provided lump sums of funds to DOCUPAC in order to pay out this money. Then it paid out the money, and then it was reimbursed after the fact for the funds that were provided to the government. How would the government be paying twice? It's not clear at what point, if I could amend that. There is information within the record in the task order that there were funds that were supposed to be provided to be paid up front. But the way that the program was administered, according to the testimony from Mr. Crane and Mr. Stewart, was that DOCUPAC would pay money up front and then submit an invoice to the DOD, which was consistent with the government-required processes for how contractors are paid for these types of contracts, asking for the money back. So it's what you said. I don't want to take up this much time with this, and I'm sorry. Go ahead. It's what you said initially about the visas being funded out of a pool of money. Was that incorrect? That's incorrect, Your Honor, according to the testimony. That is incorrect. What I meant to say was that there was a line item in the task order that had provided for several million dollars to be sent to DOCUPAC, but what the testimony indicates in this case is that, as I said, Mr. Crane specifically testified, if you don't submit a form, you don't get reimbursed. And at the end of the day, what happened in this case, as Mr. In any of these other cases, I'm now shifting from the evidence to the case law, do any of the cases out there involve a reimbursement? Yes. A number of the cases involve reimbursement. Just tell me which ones. You don't have to tell me anything about which ones should we look at to get the best view of that. So I think Hall itself is a case where you're supposed to submit invoices in order to maintain money that had been forwarded to you previously. Doesn't Hall, isn't Hall one of the direct transaction cases between the individual who's the direct recipient of government funds? Your Honor, I see my time has expired. May I answer that question? I'm not interested. By all means. Yeah, so Hall, again, Hall is a case which sets forth a number of open-ended, practical-based factors to consider whether or not there is an additional which is whether Hall involves somebody who is the direct recipient of government funds. No, it doesn't involve that. It involves a subcontractor of a subcontractor of a subcontractor. Okay, that's all you need to say. Your Honor, my time has expired unless this panel has any more questions. Apparently not. Thank you very much. Thank you. Thank you, Your Honors. Briefly on rebuttal, two quick points. One is I can't help but be frustrated that we're trying to get so microscopic about issues that just absolutely were not really discussed at trial and evidence that was not put on. I agree with you that presumably there is some true base contract. We don't have it. We're trying to read tea leaves here based on evidence that does not exist. And I want to clarify one quick point. The government is correct that the defense, it was a co-defendant, but the defense put this contract into evidence. But the reason is important in this case. We thought if they got no contract, then we win. And the court, in fact, excluded, prohibited the government from putting it on because it was the wrong contract. The court did not, however, preclude the witnesses from talking about that contract. So the government put these witnesses on. They spoke about the contract. And I don't know how best to say it, but they said the wrong thing. I don't want to say they lied, but they said things that were not true about the contract, provisions that were not in the contract. They said the contract says that you can't get kickbacks from the recruiting assistant. It doesn't say that. And so all of a sudden that's in evidence. And we could go up there and impeach these witnesses with that, but then the proof against that would not be in evidence. We just have undermined their credibility. And so we had to put the contract that we had on. And we had always made the point that this was not the right contract. So I just don't want it to seem like a concession that this was the contract. I believe the co-counsel in that case had. Because the only one you had to impeach him with was the one from a prior year. Exactly. At a different transaction. Right. And that was not some ratification of this contract as the one document that could possibly control this whole scenario. And so the whole trial was frustrating in that sense because we were forever trying to get any evidence that could show what the government needed to show to make its case. That not just DocuPack was subject to some government control, but also that the recruiting assistants were. And printouts of an online quiz. I mean, they didn't even have the online quiz that the co-defendants actually took. They didn't even have evidence. They just said, oh, well, they would have had to have taken these. I mean, there was nothing there. And we were constantly fighting against that. And by no means does that mean we think that this task order was just the end all and be all of this arrangement. Thank you. Thank you very much. And the case is submitted.